[Cite as *Chasteen v. Lynch*, 2024-Ohio-5857.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| ADAM CHASTEEN, | : | |
| Appellant, | : | CASE NO. CA2023-04-047 |
| | : | O P I N I O N<br>12/16/2024 |
| - vs - | : | |
| | : | |
| RACHEL LYNCH, | : | |
| Appellee. | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DV 2022-07-0492


Adam Chasteen, pro se.

Rachel Lynch, pro se.


**BYRNE, J.**

{¶ 1} Adam Chasteen ("Father") appeals from the decision of the Butler County Court of Common Pleas, Domestic Relations Division, which denied his petition for a domestic violence civil protection order ("DVCPO") to protect his minor daughter, "Eve,"

from her mother, Rachel Lynch ("Mother").[1]  For the reasons discussed below, we affirm.

## I. Factual and Procedural Background

## A. Ex Parte Temporary Protection Order

{¶ 2}  On July 20, 2022, Father petitioned the domestic relations court for a DVCPO pursuant to R.C. 3113.31.  Father alleged in the DVCPO petition that Mother caused physical harm to Eve.  Specifically, Father alleged that on July 8, 2022, Mother attacked Eve, scratched Eve's left arm multiple times, and drew blood.  Father stated that Mother pinned Eve on a bed, punched her in the chest, and dug her knees into Eve's abdomen.  Father stated that Eve was able to get free of Mother and then ran to a neighbor who called 9-1-1 after observing Eve's injuries and her emotional state.

{¶ 3}  Father alleged that after the incident Mother avoided contact with police. Additionally, Father alleged that child protective services opened an investigation into the incident but was unsuccessful in locating or contacting Mother.  Father alleged that Mother refused to open the door at her residence or answer phone calls from child protective services and the police.

{¶ 4}  A domestic relations court magistrate held an ex parte hearing on the same day that Father filed the DVCPO petition.  The magistrate later issued an ex parte temporary protection order naming Eve as a protected person and prohibiting Mother from contacting or approaching Eve.  The order further appointed Father to be Eve's temporary custodian and suspended Mother's parenting time rights.

## B. DVCPO Hearing

{¶ 5}  A domestic relations court magistrate held a two-day hearing on Father's DVCPO petition.  We have summarized the key testimony relevant to this appeal below.

---

1. "Eve" is a pseudonym adopted in this opinion for purposes of privacy and readability.  *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

{¶ 6}   As a preliminary matter, we note that the record reflects that Mother was the sole residential parent of Eve when Father filed for custody of Eve in fall of 2021 in the Butler County Court of Common Pleas, Juvenile Division.  That action is separate from the DVCPO matter on appeal in this case, arising out of the Butler County Domestic Relations Court.

## 1.  Father's Case

### a.  Eve's Testimony

{¶ 7}   Eve testified that she was born in June 2008, making her 14 years old at the time of the key events in this case.  When asked if she knew why she was testifying, Eve stated that she was there to stand up for herself regarding what happened on July 8, 2022, and to tell the court why she wanted to live with Father.

### i.  Eve's Testimony Regarding July 8, 2022 Incident

{¶ 8}   Eve testified that on July 8, 2022, she was dropped off at Mother's home at around 5:30 p.m.  This was shortly before Father was scheduled to pick her up at 6:00 p.m. to begin his previously-scheduled weekend with her.  Mother, who was sitting on the couch and appeared angry, asked Eve where Eve's phone was.  Eve responded that it was in her pocket. Mother then asked Eve for the phone. Eve responded, "Why?" Mother again demanded the phone, and Eve gave it to her.  Mother then asked Eve for the phone's password but Eve refused.  According to Eve, she refused "out of fear" because Mother had taken her phone previously and "deleted evidence that I had with my father" that would "help us with the case."  Later in her testimony, Eve clarified that by referring to "the case," she was referring to "the juvenile case that we've got on for custody."

{¶ 9}   Next, Eve walked to her bedroom and started packing her bag in preparation for leaving with Father.  Mother began yelling at her and aggressively ripped the bag away from Eve.

{¶ 10} Eve sat down on her bed. According to Eve, Mother then lunged at her, grabbed Eve's forearms, and pushed her back on the bed. Mother then got on top of Eve and kneed her in her abdomen and hip area. Mother was holding onto Eve's left arm.

{¶ 11} Eve stated that she had a few "markings" on her arm and "scars" where Mother dug her nails into Eve's arm and drew blood. During Eve's testimony, Father introduced photographs of Eve depicting the injuries allegedly sustained in the altercation with Mother. The photographs depict lacerations on Eve's arm and elbow.

{¶ 12} Eventually, Eve pushed Mother away, to which Mother said, "you little 'B' word. You hit me. You hit me." Eve ran out of the house and to the house of Father's friend, whom she had known since she was young. She told the friend what happened, and the friend called the police.

{¶ 13} The police arrived, placed Eve in their vehicle, and drove her back to Mother's house. The police knocked on the door but Mother did not answer even though her vehicle was in the driveway. The police then released Eve to Father, who was there with his vehicle.

{¶ 14} Later, Eve and Father went to the police station because the responding police had not taken any photographs of Eve's injuries. They made a report at the police station.

### ii. Eve's Testimony Regarding 2019 Incident

{¶ 15} Eve testified that an event similar to the July 8, 2022 incident had also occurred several years prior, in 2019. Eve claimed that during the 2019 incident Mother was drunk and angry when Mother pushed Eve onto her bed and was yelling at her about her phone. Later, when they were in the kitchen and still arguing about the phone, Mother "slammed" Eve on the floor and "dug" into her forearms. Mother tried to get Eve's phone from her and she "dragged me around the floor screaming and yelling." Mother then

apparently retrieved the phone from Eve because Eve testified that Mother threw the phone at her but it missed and shattered against the wall.

### iii.  Eve's Testimony Regarding January 2022 Incident

{¶ 16} Eve also testified about another earlier incident, which occurred in January 2022.  During that incident Eve was arguing with Mother about Father.  Eve was concerned that Mother was going to hit her, so she ran into the bathroom and locked the door.  Mother beat on the door, shook it, and yelled at her.  Eve said that she told Mother, "stop," and "I want to live with my dad." Eve stated she was in the bathroom for two hours.

### iv.  Objection to Testimony Regarding
### Domestic Violence Between Mother and Boyfriend

{¶ 17} Father's counsel then attempted to ask Eve about whether she had witnessed domestic violence occurring between Mother and Mother's live-in boyfriend ("Boyfriend").  Mother's counsel objected to any evidence concerning domestic violence between Mother and anyone other than Eve.  The magistrate sustained the objection, stating that he did not believe that domestic violence between adult parties committed in front of a child constitutes domestic violence to the child.  The record reflects that Father intended to offer audio recordings of verbal arguments between Mother and Boyfriend or of Mother and Eve discussing domestic disputes between Mother and Boyfriend.  The magistrate stated that he would allow Father to proffer evidence of domestic violence between Mother and Boyfriend if submitted in the form of a post-trial brief.

### v.  Eve's Cross-Examination Testimony

{¶ 18} On cross-examination, Eve stated that Father took her on a trip to Florida without Mother's knowledge in June 2022.  Eve also stated that she had not responded to two text messages and two phone calls from Mother prior to the incident in Mother's house on July 8, 2022.  Eve admitted that she used her phone to secretly record Mother

arguing with Boyfriend.

### b. Father's Testimony

{¶ 19} Father testified that he filed the DVCPO petition because the police had not arrested Mother and he felt that "further recourse" was necessary to protect Eve. On July 8, 2022, he witnessed the police knocking on Mother's door and Mother not answering. The police then allowed Eve to leave with him.

{¶ 20} Father testified that he then asked Eve if the police had taken any photographs or taken her statement; she told him they had not. Father took photographs and then went to the police station. They gave a statement at the police station. The police also took photographs after Father insisted they do so. Father thereafter contacted Butler County Children's Services, which opened a case.

{¶ 21} Father also testified about the incident between Mother and Eve in 2019, which he clarified occurred on February 1, 2019. On that day, he said, he responded to a call for help from Eve and observed physical injuries on Eve. Father identified an exhibit which was a text message from Mother to him, stating "I apologize for my actions and words last night to you, to [Eve], to everyone. I will get her phone fixed."

{¶ 22} On cross-examination, Father stated that he filed the DVCPO petition in July 2022 and that his custody case in the juvenile court was set for hearing in November 2022. Father also admitted that he had been convicted of domestic violence against Mother.

### c. Paternal Grandmother's Testimony

{¶ 23} Eve's paternal grandmother testified as to her knowledge of the events on July 8, 2022. She stated that Father contacted her saying that there was a problem with Eve. She met with Eve and observed her to be very upset. She also observed "scratches all down [Eve's] arm."

**d. Darries Griffith's Testimony**

{¶ 24} Darries Griffith, a caseworker with Butler County Children's Services, testified that he met with Eve on July 14, 2022. Eve told him that she was involved in a physical altercation with Mother and that Mother got "on top of her." Griffith also spoke with Father during his investigation.

{¶ 25} Griffith did not speak with Mother during the investigation, though he believed he attempted to contact her twice. Approximately one month later, Mother contacted him and said she had received his information from a neighbor. He told her that the agency had conducted and closed its investigation and had "waived her contact" because they were not able to meet with her.

{¶ 26} On cross-examination, Griffith identified a letter sent by the agency to Mother stating that claims of physical abuse against her were unsubstantiated.

**e. Police Officer Fails to Appear**

{¶ 27} Father subpoenaed a police officer to testify at the DVCPO hearing, but the police officer failed to appear. Father's counsel noted this failure to appear, and the magistrate indicated that the hearing would proceed with other witnesses and that the police officer could testify if he appeared at some later point during the hearing. However, the officer apparently never appeared. Father did not, during the trial proceedings, request a contempt order be issued against the police officer or request a continuance.

**f. Clarification on Ruling Regarding Evidence of
Domestic Violence Between Mother and Boyfriend**

{¶ 28} At the close of Father's case, the magistrate clarified his ruling regarding testimony concerning alleged domestic violence between Mother and Boyfriend. The magistrate found that the evidence was not relevant to the DVCPO petition because Father had included no allegations in his petition that Eve's health and safety were

impacted by viewing domestic violence between Mother and Boyfriend.

## 2. Mother's Case

### a. Mother's Testimony

{¶ 29} Mother testified that In June 2022, Eve was with Father during his vacation time when Mother learned that Father had taken Eve to Florida without Mother's knowledge. Eve's failure to communicate with her about this Florida trip upset Mother. Upon Eve's return, as a form of "gentle" discipline, Mother arranged for Eve to volunteer at a "therapeutic farm" that uses animal therapy to help children who have experienced trauma. Mother believed that this would benefit Eve by teaching Eve about the importance of communicating with Mother and using her phone appropriately.

{¶ 30} Eve was scheduled to stay with Father again from July 11 to 25, 2022. Mother testified that she had allowed Eve to spend the weekend preceding this period with Father. On Friday, July 8, Mother left work early because Eve had said she would be home at 4:30 p.m., prior to Father picking up Eve for their time together. However, Eve did not come home at 4:30 p.m. Mother began calling and texting her, but Eve did not return her calls or texts.

{¶ 31} At 5:30 p.m., Eve walked in the door, and it was apparent to Mother that she had an "attitude." Mother asked Eve if there was anything wrong with her phone. Eve said "No." Mother described Eve as walking with a "swagger."

{¶ 32} Mother then asked Eve why she did not answer her phone, given that she was on a "probationary period" for having failed to communicate with Mother in June. Mother asked Eve for the phone, but Eve would not give it to her. Mother took the phone from her, and Eve became upset.

{¶ 33} Mother noticed the phone was locked with a passcode. She told Eve she needed the passcode. Eve became very upset and went into her room and started

packing her bags as if she was leaving permanently. Mother grabbed the bag from Eve and said, "I need to talk to you about this cell phone before you're going anywhere." Mother put Eve's bag in Mother's bedroom, shut the door, and then returned to Eve's bedroom. Mother asked Eve why she was not giving her the phone's passcode. Eve, who was sitting on her bed, was acting like she was "bullying" Mother and was "acting like the aggressor." Mother testified that she then lifted Eve's leg and stated that "you're acting like a 3-year-old" so "I'm going to spank you like a 3-year-old." When Mother lifted Eve's leg, Eve punched Mother on the side of her face. The blow knocked Mother back. Eve then stood over Mother and punched her twice in the head. Eve told her to "rot in hell," called her a "stupid bitch," and ran out of the home.

{¶ 34} Mother then drove around the neighborhood looking for Eve. She eventually saw Father's friends outside of their home and asked if Eve was there. One of them indicated that she was. Mother told them that Eve needed to return home. Mother then returned home and went for a walk in order to calm down. This, Mother explained, was why she was not at home when the police came to her home.

{¶ 35} Mother denied avoiding contact with children's services. She stated that she first learned about a children's services investigation from her attorney. She then repeatedly attempted to contact the caseworker, but was initially unsuccessful in contacting him, in part, because she misspelled his email address. When she finally reached the caseworker, he informed her that the case was closed.

{¶ 36} On cross-examination, Father's counsel asked Mother if she had been in a physical altercation with Boyfriend in April 2022. Mother's counsel objected based on the magistrate's earlier ruling that testimony about this subject would not be permitted. The magistrate sustained the objection.

**C. Post-Trial Briefing and Proffered Evidence**

{¶ 37} The magistrate stated that Father could file a "post-trial brief" on the issue of domestic violence between adults in the presence of minor children, with additional proffered evidence (consisting of audio recordings) during the first day of the two-day hearing. In an entry issued after the first day of the hearing, the magistrate indicated that Father should provide this post-trial brief to the magistrate at the second day of the hearing and it would be marked as an exhibit "for purposes of argument." The record indicates that Father provided the magistrate with his post-trial brief at or before the second hearing day. However, we could not find this document in our record. Neither the docket nor the filings in our record indicate that the brief was filed by the court or marked as an exhibit. Father did attach a copy of the post-trial brief as an exhibit to his appellate brief. We will assume that Father's copy of the post-trial brief is the same post-trial brief that was provided to and reviewed by the magistrate. We will do so because (1) the magistrate indicated on the record that the post-trial brief would be marked as an exhibit and (2) Mother did not object in her appellate brief to Father's characterization of the post-trial brief that was attached to his appellate brief as being the same post-trial brief provided to the magistrate.

{¶ 38} What is clear from the record is that the magistrate accepted Father's three proffered exhibits into the record. Those exhibits consist of three unauthenticated audio files.

{¶ 39} The first audio file appears to be a recording of a verbal confrontation between two unidentified speakers, one male and one female. Much of the audio is garbled or unintelligible. A different female voice states the date and time of the audio at the end of the recording. According to Father's post-trial brief, the first audio file is a recording taken by Eve on January 8, 2022 and the two speakers are Mother and Boyfriend.

{¶ 40} The second audio file is a recording with unidentified female speakers discussing fighting between one of the speakers and a male with the same first name as Boyfriend. According to Father's post-trial brief, the second audio file consists of a recording also taken on January 8, 2022, and was a conversation between Mother, the maternal grandmother, and Eve while in the car, discussing the fight between Mother and Boyfriend.

{¶ 41} The third audio file consists of an unidentified woman repeatedly asking a man with the same first name as Boyfriend for car keys, and the man arguing with the woman. According to Father's post-trial brief, the third audio file was also recorded on January 8, 2022, and consisted of the maternal grandmother confronting Boyfriend as the fight recorded in the first audio file continued to escalate.

### D. Magistrate's Decision

{¶ 42} The magistrate issued a written decision denying Father's DVCPO petition. The magistrate noted that Father's petition alleged a single incident of domestic violence by Mother occurring on July 8, 2022. The magistrate observed that, at the hearing, Father also attempted to raise domestic violence occurring between Mother and Boyfriend, but those allegations were not included in the petition, and furthermore, there was no evidence that Mother had been convicted of domestic violence or reported her boyfriend for domestic violence. The magistrate then stated, "Regardless, the allegations of the Petition are the controlling allegations in this matter."

{¶ 43} The magistrate noted that Mother and Eve had entirely different recollections of the events of July 8, 2022.

{¶ 44} The magistrate observed that the parties had a companion case—concerning custody of Eve—in the Butler County juvenile court. The magistrate noted that the timing of Father's DVCPO petition, in addition to Eve's testimony about "our

custody case" indicated the true motivation behind the DVCPO petition. The magistrate found that the testimony and timeline suggested that Father was building support for his request for custody by seeking a DVCPO against Mother.

{¶ 45} The magistrate stated that Father must demonstrate by a preponderance of the evidence that domestic violence "has occurred" in order to obtain a DVCPO on behalf of Eve. The magistrate observed that the sole source of evidence of domestic violence was Eve's testimony, which Mother disputed. The magistrate also noted that two agencies investigated Eve's allegations but both took no action against Mother. Ultimately, after weighing the evidence, the magistrate found that Father had failed to prove by a preponderance of evidence that a final DVCPO should be issued. The magistrate denied the DVCPO petition and vacated all previously issued orders, including the ex parte temporary protection order.

### E. Father's Objections to the Magistrate's Decision

{¶ 46} Father filed objections to the magistrate's decision. Relevant to this appeal, Father argued that the magistrate erred by (1) failing to find that Father proved by a preponderance of the evidence that a final DVCPO should be issued, (2) finding that the "sole source of the allegation is the Child," (3) ruling that acts of domestic violence in front of the minor child did not constitute domestic violence to the child, (4) denying evidence of domestic violence between Mother and Boyfriend, and (5) not considering "all the individuals who testified at the [DVCPO] hearing." In addition, Father argued that he was unfairly prejudiced when the police officer he subpoenaed to testify at the DVCPO hearing did not appear to testify. Father stated that the police officer would have authenticated two police reports supporting Eve's recollection of events.

### F. The Domestic Relations Court's Decision on Father's Objections

{¶ 47} In ruling on Father's objections, the domestic relations court judge found

that Eve repeatedly testified that she refused to give Mother the phone because she was afraid that Mother would "delete the evidence that would help us with this case." The judge noted that much of Eve's testimony centered around where she wanted to live and what Eve described as "evidence." The judge stated that it appeared that Eve and Father were communicating "in tandem" about collecting "evidence" against Mother. The judge also noted that Father attempted to involve children's services and the police but neither found any basis for action against Mother.

{¶ 48} Ultimately, the judge, referring to the statutory definition of an "abused child," stated that it "cannot find that [Father] proved by clear and convincing evidence that [Mother] recklessly caused emotional harm to the parties' daughter, or recklessly committed acts that amounted to child endangering, or committed domestic violence in any other manner as it regards the child." The judge further noted that a parent's retrieval of a cell phone from a 14-year-old child does not amount to an act or omission that places the child in danger pursuant to the DVCPO statute. Ultimately, the judge agreed with the magistrate's assessment that Father's petition appeared to be an "effort to influence" the outcome of his separate, pending custody case. For these reasons the domestic relations court affirmed the magistrate's denial of the DVCPO petition

{¶ 49} Father filed a pro se appeal in which he raised six assignments of error. Mother filed a pro se appellee's brief. However, her brief did not specifically respond to Father's assignments of error and she instead made arguments apparently related to the ongoing custody dispute with Father in the juvenile court. Those custody issues are not before us.

## II. Law and Analysis

{¶ 50} Before addressing the merits of Father's appeal, we note that the disposition of this appeal was delayed due to issues with Father's briefing. In reviewing this appeal,

we reviewed the case citations in Father's appellate briefs and we found that many of the citations were erroneous. These erroneous citations fall into two groups.

{¶ 51} First, Father's briefs include 17 citations to opinions that, upon our review, do not appear to exist. That is, these 17 citations lead to opinions in cases with different names than the names cited by Father, and the content of those other opinions was entirely irrelevant to the propositions of law that Father claimed the cited opinions supported. We then attempted to search for these 17 opinions in Westlaw and Lexis using the same case names and other descriptive information provided by Father, but we were unable to locate any of them. These 17 case citations appear to be complete fabrications.

{¶ 52} Second, we found that eight citations in Father's briefs lead to opinions in cases with the same names provided by Father, but that Father's description of those opinions had nothing to do with the actual content of the opinions.

{¶ 53} We only found eight case citations in Father's briefs that exist, are correctly cited, and speak in some way to the propositions of law stated by Father.

{¶ 54} After discovering these problems with Father's case citations, we ordered Father to provide us with copies of the 17 opinions cited in his briefs that we were completely unable to locate. In response, Father requested two extensions of time to comply with our order. Ultimately, after we ordered Father to show cause why his appeal should not be dismissed, Father filed a response indicating that he, too, could not locate the relevant cases cited *in his own brief*. Instead, Father requested that we "disregard" the questionable case citations in his brief and rule on the merits of his appeal without reference to those case citations. Father has never sufficiently explained how so many seemingly fabricated cases were cited in his brief.

{¶ 55} We do not know the process that resulted in the fabricated and/or incorrect

case citations being included in Father's briefs. It is possible that Father used an artificial intelligence tool to write his brief, and that this tool fabricated multiple case citations. Or there may be some other explanation. Regardless, we remind all parties and attorneys who may appear before our court that false citations not only will be disregarded by this court, but may result in sanctions.

{¶ 56} Regardless, in the interest of justice, we are ruling on the merits of Father's appeal. We have disregarded every case cited in Father's brief other that those we have determined were accurately cited and in some way support the proposition of law stated by Father.

## A. Domestic Violence Evidence

{¶ 57} Father's first assignment of error states:

> THE TRIAL COURT ERRED BY REFUSING TO ALLOW TESTIMONY AND EVIDENCE DURING THE TRIAL THAT RELATED TO MULTIPLE INSTANCES OF DOMESTIC VIOLENCE (DV) TRANSPIRING IN THE PRESENCE OF THE MINOR CHILD.

{¶ 58} In his first assignment of error, Father argues that the domestic relations court erred in not allowing evidence related to instances of alleged domestic violence between Mother and Boyfriend that occurred in Eve's presence.

{¶ 59} During the DVCPO hearing, Father repeatedly attempted to introduce evidence concerning an alleged history of domestic violence between Mother and Boyfriend. Mother's counsel objected to Father's attempts to introduce this evidence. Initially, the magistrate ruled that the court would not consider such evidence because the magistrate did not believe that domestic violence between adults constituted domestic violence to a child who was merely present.

{¶ 60} Later in the hearing, the magistrate clarified that evidence regarding the alleged history of domestic violence between Mother and Boyfriend was not admissible

- 15 -

because it was unrelated to the sole allegation of domestic violence in Father's petition, i.e., the alleged domestic violence incident between Mother and Eve that occurred on July 8, 2022. Father requested to amend the petition to include his other allegations of domestic violence between Mother and Boyfriend, but the magistrate denied that request. The magistrate did allow Father to proffer evidence related to his other allegations, namely, the three audio files discussed above.

{¶ 61} In overruling Father's objections to the magistrate's decision, the domestic relations court judge did not specifically address Father's argument that the magistrate erred in excluding evidence regarding the alleged domestic violence incidents involving Mother and Boyfriend. However, the judge addressed the issue, without discussion, when she stated, "The court further affirms the Magistrate's rulings on the evidence" and overruled Father's objections.[2] Neither the magistrate nor the court explicitly discussed the proffered audio recordings.

{¶ 62} "Decisions regarding the admission or exclusion of evidence rest within the sound discretion of the domestic relations court." *Lykins v. Lykins*, 2021-Ohio-274, ¶ 44 (12th Dist.). An abuse of discretion implies the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 63} Upon consideration, we cannot find that the domestic relations court abused its discretion in excluding testimony or other evidence regarding alleged domestic violence between Mother and Boyfriend.

{¶ 64} A statute, R.C. 3113.31, governs the issuance of a DVCPO. *Hankinson v.*

---

2. In an October 3, 2022 "All Purpose Entry," the domestic relations court judge did note that Father's counsel had submitted a memorandum to the magistrate at the final hearing regarding alleged violence between Mother and Boyfriend taking place in front of Eve. The court noted that this allegation was not in the DVCPO petition and only the incident between Mother and Eve was listed in the petition. In its decision overruling objections, the court may have been referring to the magistrate's clarified ruling on the admissibility of this evidence.

*Cooper*, 2022-Ohio-1896, ¶ 13 (12th Dist.). "Pursuant to that statute, for the petitioner to obtain a DVCPO against the respondent, 'the petitioner must prove by a preponderance of the evidence that the respondent has engaged in an act of domestic violence against petitioner, petitioner's family, or petitioner's household members.'" *Id.*, quoting *McBride v. McBride*, 2012-Ohio-2146, ¶ 12 (12th Dist.). Another statute, R.C. 2151.031, provides that, for purposes of R.C. 3113.31, a child may be subjected to domestic violence and entitled to a DVCPO (1) if the child is endangered within the meaning of R.C. 2919.22 or (2) suffers physical or mental injury that harms or threatens to harm the child's health or welfare as the result of the action of the child's parent, guardian or custodian. However, the statute authorizing petitions for DVCPOs also states:

> The petition *shall contain or state*:
>
> An allegation that the respondent engaged in domestic violence against a family or household member of the respondent or against a person with whom the respondent is or was in a dating relationship, *including a description of the nature and extent of the domestic violence* . . . .

(Emphasis added.) R.C. 3113.31(C)(1). The DVCPO petition must therefore describe the specific "nature and extent" of domestic violence alleged. *Id.*

{¶ 65} A respondent to a petition for a DVCPO is entitled to be served with the petition before the full hearing on the petition. *See* R.C. 3113.31(D)(2)(a)(i). A respondent is also entitled to a "full hearing" on the matters alleged in the petition. R.C. 3113.31(D)(2)(a). The term "full hearing" is not defined in the statute, but has been interpreted by other courts to embrace,

> not only the right to present evidence, *but also a reasonable opportunity to know the claims of an opposing party and to meet them* . . . A "full hearing" is one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety of the step asked to be taken.

- 17 -

(Emphasis added.) *Deacon v. Landers*, 68 Ohio App.3d 26, 29-30 (4th Dist. 1990). *Accord D.M.W. v. E.W.*, 2018-Ohio-821, ¶ 12 (10th Dist.).

{¶ 66} Father did not assert anything in his DVCPO petition about alleged domestic violence between Mother and Boyfriend or the impact of that domestic violence on Eve. Instead, the only specific allegation set forth in the petition concerning domestic violence related to the July 8, 2022 incident involving the alleged physical altercation between Mother and Eve. The only other allegation of domestic violence set forth in the petition was Father's general allegation that Mother "has a history of domestic violence against [Father]." Well over two months elapsed between the filing of the petition and the first hearing date. During this time, Father never sought leave to amend the petition to include additional allegations concerning domestic violence between Mother and Boyfriend. Though Father did request leave to amend his petition for this purpose during the hearing, he did not object to the magistrate's refusal to grant this motion. Nor has he appealed the denial of his request to amend the petition.

{¶ 67} For these reasons, the magistrate's decision to disallow testimony and other evidence regarding alleged domestic violence between Mother and Boyfriend at the hearing was reasonable and not an abuse of discretion. Mother was entitled to notice of the grounds upon which Father was alleging that Eve was in danger of domestic violence through her conduct. *See* R.C. 3113.31(C)(1). The magistrate could reasonably conclude that for Mother to be forced to defend herself at the hearing against new accusations that were not included in the petition for DVCPO would not comport with due process and could implicate Mother's entitlement to a "full hearing" under R.C. 3113.31. *Deacon*, 68 Ohio App.3d at 29-30.

{¶ 68} We overrule Father's first assignment of error.

### B. Proffered Evidence

{¶ 69} Father's second assignment of error states:

THE TRIAL COURT ERRED BY FAILING TO ADMIT AND CONSIDER THE PROFFERED EVIDENCE CONTAINED IN THE POST-TRIAL BRIEF RELATING TO THE OCCURRENCE OF MULTIPLE DOMESTIC VIOLENCE (DV) INCIDENTS THAT OCCURRED IN THE PROXIMITY OF THE MINOR CHILD.

{¶ 70} In his second assignment of error, Father reiterates the arguments he set forth in his first assignment of error, but he also argues that the court erred by failing to consider the proffered evidence regarding the alleged incidents of domestic violence between Mother and Boyfriend.

{¶ 71} This assignment of error is without merit for two reasons.

{¶ 72} First, we have already found that the court did not err in not considering evidence regarding alleged domestic violence between Mother and Boyfriend. Assuming the proffered audio recordings concerned alleged domestic violence between Mother and Boyfriend, the audio recordings were not relevant to the allegations in Father's DVCPO petition.

{¶ 73} Second, even if the domestic relations court erred in not considering testimony regarding alleged domestic violence between Mother and Boyfriend (which we do not find), we would not need to consider whether the court erred by not considering the proffered audio recordings because such error would have been harmless. This is the case because the proffered audio recordings were not authenticated with an affidavit or otherwise. The court would have had to speculate about the identity of the speakers in the audio recordings and the context or circumstances of the conversations in those recordings in order to consider them. They could not do so. *See* Evid.R. 901(A).

{¶ 74} In reaching this conclusion, we do not diminish the potential significance of the proffered audio recordings. The recordings suggest the possibility of domestic

violence between Mother and Boyfriend in the home Mother shared with Eve. However, domestic violence between Mother and Boyfriend in Eve's presence was not the allegation presented in the DVCPO petition. This evidence may be relevant to the juvenile court in assessing a custody decision and Eve's best interest. But that is not the matter before us today.

{¶ 75} We overrule Father's second assignment of error.

### C. Witness' Failure to Appear

{¶ 76} Father's third assignment of error states:

> APPELLANT WAS UNFAIRLY PREJUDICED BY OFFICER JOSHUA CROWTHERS' FAILURE TO APPEAR AND AUTHENTICATE KEY EVIDENCE.

{¶ 77} Father argues that the domestic relations court erred by failing "to address" or "offer remedial action" when the police officer he subpoenaed to appear at the DVCPO hearing failed to appear. Father argues that the police officer could have authenticated a police report which stated that Eve ran into a 9-1-1 caller's house claiming that Mother "beat her up" and that Eve "does have cuts on her arm," and that Mother did not answer her door or phone following the incident.

{¶ 78} Initially, we note that the police officer's failure to comply with the subpoena was not the result of any act or failure to act by the domestic relations court. Father attempts to circumvent this issue by alleging that the magistrate erred in not continuing the hearing or not offering some sort of "remedial action" in response to the officer's failure to appear. However, at the DVCPO hearing Father neither requested a continuance nor requested the magistrate hold the officer in contempt of court; it was not error for the magistrate to fail to take these actions, sua sponte. *See I.S. v. I.S.S.*, 2024-Ohio-2083, ¶ 23-24 (10th Dist.) (no error by court in electing not to sua sponte hold in contempt subpoenaed witnesses who failed to appear). We find no error here.

{¶ 79} The police report was not "crucial" evidence, as claimed by Father. The police report merely restated evidence introduced at the DVCPO hearing through other direct witness testimony or exhibits. Eve testified that Mother assaulted her and that the cuts on her arms were the result of that altercation. And Father introduced photographs of those injuries. Eve testified that the police attempted to contact Mother but were unsuccessful. Father also testified that he observed Mother not answering police. The police report merely reiterated facts already testified to at the hearing or demonstrated through exhibits. *See* Evid.R. 403(B) (relevant evidence may be excluded if its "probative value is substantially outweighed by considerations of . . . needless presentation of cumulative evidence.") As a result, the officer's failure to appear and authenticate the police report (assuming the officer would have done so) did not unfairly prejudice Father.

{¶ 80} We overrule Father's third assignment of error.

### D. Trial Court's Impartiality and Bias

{¶ 81} Father's fourth assignment of error states:

> THE TRIAL COURT PREJUDICED APPELLANT BY DEMONSTRATING A LACK OF IMPARTIALITY AND BIAS DURING THE PROCEEDINGS.

{¶ 82} In Father's fourth assignment of error, he argues that the domestic relations court displayed bias and a lack of impartiality. He also states that the court's bias was demonstrated by various decisions that the court made that were contrary to Father's interests. For example, Father argues that the court displayed partiality by dismissing "the child's account of the domestic violence she suffered by [Mother]." Father also cites the court's refusal to consider the evidence she proffered of domestic violence between Mother and Boyfriend.

{¶ 83} In this assignment of error, Father refers generally to the "court." He does not make clear whether his bias argument pertains to the magistrate, to the judge, or to

both.

**{¶ 84}** To the extent Father's bias argument pertains to the magistrate, the applicable rule is Civ.R. 53(D)(6). That rule provides that "Disqualification of a magistrate for bias or other cause is within the discretion of the court and may be sought by motion filed with the court." Civ.R. 53(D)(6). "In turn, [an appeals] court reviews a trial court's decision on whether to remove a magistrate from the proceedings under an abuse of discretion standard." *Cutler v. Reed*, 2016-Ohio-1151, ¶ 19 (12th Dist.).

**{¶ 85}** Here, Father failed to file a motion to disqualify the magistrate with the domestic relations court, and as a result Father's argument that the magistrate was biased is waived and need not be considered further. *Akarah v. Ohio Dept. of Rehab. & Corr.*, 2024-Ohio-4499, ¶ 30 (10th Dist.) (the appellant "never filed a motion to disqualify the court's magistrate for bias[,]" so the appellant "waived his claim that the magistrate was biased"); *Barton v. Barton*, 2015-Ohio-5194 (5th Dist.) ("There was no motion before the trial court to disqualify the magistrate for bias[,]" so the matter was waived); *Caldwell v. Koehler*, 2023-Ohio-4527, ¶ 32 (5th Dist.) ("because appellant failed to file a motion to disqualify the magistrate pursuant to [Civ.R. 53(D)(6)], the issue is waived").

**{¶ 86}** To the extent Father's bias argument pertains to the domestic relations court judge, we note, as an initial matter, that "[t]he question of a judge's alleged bias or prejudice is not a proper subject for appellate review." *Simpson v. Moreland*, 2024-Ohio-1728, ¶ 27 (12th Dist.). A statute, R.C. 2701.03(A), states:

> If a judge of the court of common pleas allegedly is interested in a proceeding pending before the court, allegedly is related to or has a bias or prejudice for or against a party to a proceeding pending before the court or a party's counsel, or allegedly otherwise is disqualified to preside in a proceeding pending before the court, any party to the proceeding or the party's counsel may file an affidavit of disqualification with the clerk of the supreme court in accordance with division (B) of this section.

This statute "provides the exclusive means by which a litigant may claim that a common pleas judge is biased and prejudiced." *Vogel v. Felts*, 2008-Ohio-6569, ¶ 14 (12th Dist.), citing *Vera v. Yellowrobe*, 2006-Ohio-3911, ¶ 54 (10th Dist.). Only the Ohio Supreme Court has the authority to determine whether a judge is biased or prejudiced. *Blair v. Adkins*, 2021-Ohio-2292, ¶ 9 (12th Dist.), citing *In re Guardianship of Constable*, 1998 WL 142381, *4 (12th Dist. Mar. 30, 1998) (""[a] court of appeals is without authority to pass upon the disqualification of a judge'"), quoting *State v. Blankenship*, 115 Ohio App. 3d 512, 516 (12th Dist. 1996); *State v. Lutz*, 2001 WL 1598768, *2 (12th Dist. Dec. 17, 2001). We are therefore "without authority to pass upon disqualification [of a judge for alleged bias] or to void the judgment of the trial court upon that basis." *Simpson* at ¶ 27, quoting *State v. Ramos*, 88 Ohio App.3d 394, 398 (9th Dist. 1993).

{¶ 87} As the record indicates, Father never asked the domestic relations court judge to recuse herself from these proceedings, nor did Father file an affidavit of disqualification with the Ohio Supreme Court pursuant to R.C. 2701.03(A).

{¶ 88} We overrule Father's fourth assignment of error.

### E.  Denial of Petition for DVCPO

{¶ 89} Because they overlap, we will review Father's fifth and sixth assignments of error together.

{¶ 90} Father's fifth assignment of error states:

> THE TRIAL COURT ERRED IN ITS JUDGEMENT BY DISMISSING APPELLANT'S PETITION, CONTRARY TO THE PREPONDERANCE OF THE EVIDENCE.

{¶ 91} Father's sixth assignment of error states:

> THE TRIAL COURT JUDGE COMMITTED REVERSIBLE ERROR WHEN IT DENIED APPELLANT'S OBJECTIONS TO THE MAGISTRATE'S ORDER DENYING THE PETITION.

{¶ 92} In Father's fifth and sixth assignments of error, he again reiterates his arguments concerning the magistrate's and the judge's purported failure to consider the proffered evidence regarding alleged domestic violence between Mother and Boyfriend. To the extent Father simply reiterates arguments we have already addressed, we find no merit to these arguments for the same reasons stated above.

{¶ 93} However, in his fifth and sixth assignments of error Father also makes various arguments disagreeing with the magistrate's and the judge's assessments of the testimony and other evidence presented at the DVCPO hearing. He states that the magistrate erred by disregarding "key testimonies and physical evidence indicative of domestic violence inflicted upon the minor child." He argues that the magistrate and/or the judge erred by not believing Eve's testimony, by not crediting the "photographic proof" offered by Father, by not crediting the paternal grandmother's testimony, by crediting the Butler County children's services agency's decision not to take action against Mother, and more. He also argues that it is "deeply troubling" that the judge suggested Eve's testimony was influenced by Father as part of his effort to affect the pending juvenile court custody proceeding. Father also presents his own interpretation of the significance of various testimony offered by witnesses at the DVCPO hearing.[3]

{¶ 94} In other words, Father argues that the magistrate's and trial court's decisions with respect to the key question of whether Eve was subjected to domestic violence by Mother were against the manifest weight of the evidence.

{¶ 95} In order to obtain a DVCPO under R.C. 3113.31, the petitioner must prove

---

3. In his sixth assignment of error, Father also briefly refers to "reversible" error in the domestic relation court's ruling on an aspect of the magistrate's decision addressing Eve's cell phone. Eve's cell phone and its disposition was addressed in the temporary ex parte order and was also the subject of a later motion for contempt filed by Father. Father did not separately assign error to this issue and has not articulated how the court committed reversible error with citation to the record or legal authorities. *See* App.R. 12(A)(2) and 16(A). We disregard this argument.

that the respondent has engaged in an act of domestic violence against petitioner or petitioner's family or household members. *McBride v. McBride*, 2012-Ohio-2146, ¶ 12 (12th Dist.), citing *Felton v. Felton*, 79 Ohio St.3d 34, 1997-Ohio-302, paragraph two of syllabus. A trial court's decision to deny or grant a DVCPO will not be reversed where such decision is supported by the manifest weight of the evidence. *Halcomb v. Greenwood*, 2019-Ohio-194, ¶ 36 (12th Dist.). The standard of review in a manifest weight challenge in a civil case is the same as that applied to a criminal case. *Id*. In considering a manifest weight challenge, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial. *Id*. A judgment will not be reversed as being against the manifest weight of the evidence where the judgment is supported by some competent, credible evidence going to all essential elements of the case. *Id.* An appellate court is required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate factual conclusions. *Holland v. Garner*, 2010-Ohio-2963, ¶ 8 (12th Dist.).

{¶ 96} Upon review, the magistrate, and subsequently the domestic relations court judge, clearly did not find Eve a credible witness with respect to her allegations of physical domestic violence by Mother on July 8, 2022. In reviewing Eve's and Mother's testimonies, we find that there is support in the record for the magistrate's and judge's determinations that Eve's allegations were not credible and that the true motivation behind the DVCPO petition was to support Father's separate request for custody of Eve. During her testimony, Eve explained she was there to testify about why she wanted to live with Father. She repeatedly used language referring to Father's custody petition as a joint petition between herself and Father. Eve's testimony explaining why she refused to give

Mother her cell phone password focused on her fears related to Mother deleting "evidence" that would support Father's custody petition. And though Eve and Father reported Eve's allegations to police and children's services, no actions were taken as a result, indicating these agencies found no merit to Eve's claims. In light of this evidence, the court could reasonably conclude that Mother's testimony as to the July 8, 2022 incident was more credible, i.e., that Eve reacted violently and ran away after Mother asked Eve why she was not answering her cell phone, demanded that Eve turn over and unlock her cell phone, and then attempted to discipline Eve with a spanking.

{¶ 97} The domestic relation court's decision is not against the manifest weight of the evidence simply because the court did not find Eve credible. It is well established that the trial court, particularly a domestic relations court, is in the best position to resolve disputes of fact and assess the credibility of witnesses and the weight to be given their testimony. *Halcomb* at ¶ 40, citing *Bates v. Bates*, 2005-Ohio-3374, ¶ 38 (10th Dist.). Because the domestic relations court was best suited to assess Eve's credibility and the weight to be given to her testimony, we decline Father's invitation to substitute our judgment for that of the domestic relations court.

{¶ 98} For all of these reasons, we find that the domestic relation court's decision to deny Father's petition for a DVCPO was not against the manifest weight of the evidence.[4]

{¶ 99} We overrule Father's fifth and sixth assignments of error.

### III. Conclusion

{¶ 100} For the reasons described above, we find that Father's six assignments of

---

4. We note that the magistrate correctly applied the "preponderance of the evidence" burden of proof in reviewing the DVCPO petition. *State v. McBride*, 2012-Ohio-2146, ¶ 12 (12th Dist.). The domestic relations judge, in reviewing Father's objections, stated, perhaps inadvertently, that it was applying the "clear and convincing evidence," burden of proof. Father did not raise this issue in his appeal, so he forfeited this issue and we do not address it in our analysis.

error are all without merit, and we overrule those assignments of error.

{¶ 101} Judgment affirmed.


S. POWELL, P.J., and HENDRICKSON, J., concur.