[Cite as *Robertson v. Park*, 2026-Ohio-388.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| RUTH ROBERTSON, | : | |
| Appellee, | : | CASE NO. CA2024-09-115 |
| | : | OPINION AND JUDGMENT ENTRY |
| - vs - | | 2/9/2026 |
| | : | |
| PHYLLIS PARK, | : | |
| Appellant. | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DV2024-03-0164


Charles H. Bartlett, Jr., for appellee.

The Lampe Law Office, LLC, and Stephen Otte, for appellant.


## O P I N I O N


**BYRNE, J.**

{¶ 1}   This case involves a minor child, "Ruby."[1] Ruby's mother ("Mother") filed a

---

1. Ruby is a pseudonym, used here for purposes of improving the readability of the opinion and to protect the child's privacy. *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

petition for a domestic violence civil protection order ("DVCPO") barring Ruby's paternal grandmother ("Grandmother") from having contact with Ruby. The Butler County Court of Common Pleas, Domestic Relations Division, granted Mother's petition. Grandmother appeals from that decision. For the reasons discussed below, we affirm.

## I. The DVCPO Statute

{¶ 2}   A statute, R.C. 3113.31, describes the requirements and procedures for obtaining a DVCPO. Because the specific language of the DVCPO statute is relevant not only to our analysis of Grandmother's assignments of error but also to our discussion of the factual and procedural background of this case, we begin with a brief explanation of that statute.

{¶ 3}   As the term "domestic violence civil protection order" suggests, "[w]hen granting a [DVCPO], the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of *domestic violence*." (Emphasis added.) *Felton v. Felton*, 79 Ohio St.3d 34, paragraph two of the syllabus (1997), citing R.C. 3113.31(D). In relevant part, the DVCPO statute defines "domestic violence" to mean:

> (a) The occurrence of one or more of the following acts against a family or household member:
>
> (i) Attempting to cause or recklessly causing bodily injury;
>
> (ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [menacing by stalking] or 2911.211 [aggravated trespass] of the Revised Code;
>
> (iii) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;
>
> (iv) Committing a sexually oriented offense.

R.C. 3113.31(A)(1)(a)(i)-(iv).

{¶ 4} Only two of these subsections are relevant to the case before us. We will refer to R.C. 3113.31(A)(1)(a)(ii) as the "(ii) subsection" and to R.C. 3113.31(A)(1)(a)(iii) as the "(iii) subsection."

## II. Factual and Procedural Background

### A. Mother's DVCPO Petition

{¶ 5} Mother and Father are divorced and share custody of Ruby, their 11-year-old daughter. When Father has parenting time with Ruby, he is often working. Ruby's paternal grandparents act as Ruby's caregivers during the time Father is unavailable to watch Ruby.

{¶ 6} On March 18, 2024, Mother petitioned the Butler County Court of Common Pleas, Domestic Relations Division, for a DVCPO pursuant to R.C. 3113.31. In the petition, Mother named Grandmother as the respondent and the protected person as Ruby. Mother alleged that Ruby was fearful of Grandmother and that Grandmother yelled and screamed at her, called her names like "loser," and told her "I control your head." Mother alleged that Grandmother had threatened to hit Ruby if she forgot things, that Grandmother would speak negatively about Mother in Ruby's presence, and that Ruby felt she had to agree with Grandmother's comments or the yelling would get worse. Mother further alleged that Ruby was discussing suicide, there were guns at Grandmother's home, and Ruby told Mother that she knew how to get to the guns. Mother further alleged that Ruby had reported hearing "people" tell her to kill herself.

{¶ 7} On the same day as the filing of the DVCPO petition, the domestic relations court granted Mother a preliminary protection order, ex parte.

### B. Evidence at Petition Hearing

{¶ 8} On April 26, 2024, the domestic relations court, through its magistrate, held a full hearing on Mother's DVCPO petition. Mother called two witnesses at the DVCPO

hearing: Ruby and Antionette Walker. We have summarized their testimony below. Grandmother presented no evidence and called no witnesses.

### 1. Ruby's Testimony

{¶ 9} Ruby testified that she was 11 years old, in the 5th grade, and lived with Mother. Ruby recalled that Mother took her to the hospital in March 2024 because she was suicidal. She then went to Beckett Springs Behavioral Health ("Beckett Springs") and spoke to Walker. She testified that she told Walker the truth.

{¶ 10} Ruby explained that when she was with Father, he would often be working or grocery shopping. Father would leave her with her grandparents and she would spend the entire week at her grandparents' home.

{¶ 11} Ruby stated that she began feeling suicidal because she was being yelled and screamed at "a lot" by Grandmother. She stated that Grandmother would yell at her and then would lock her in her room. Grandmother would lock Ruby in her room until "mealtime" and then after the meal was over she would send Ruby back to her room.

{¶ 12} Ruby stated that Grandmother would lock her in her room for "bad grades" and would yell at her over nothing. When Grandmother would yell at her, she would tell her how "bad my mommy is" and would tell her that Mother "wasn't very kind" to Father.

{¶ 13} Ruby testified that Grandmother had once threatened Ruby if she "forgot things," stating that she would take away her electronics and hit her. Grandmother then told Ruby a story about how Grandmother had hit Ruby's aunt.

{¶ 14} Ruby stated that she had been hearing voices. The voices would tell her to grab something sharp or a gun. However, she was no longer hearing voices because she was on a new medication. Ruby had been on a different medication previously, but Grandmother would not give it to her because she thought it was making her sick. Instead, Grandmother threw the medication away.

{¶ 15} Ruby stated that she was also feeling suicidal because of bullying issues at school. On cross examination, Grandmother's counsel asked Ruby if Grandmother locked her in her room "a lot or a little, or has it happened once?" Ruby responded, "a little."

## 2. Antionette Walker's Testimony

{¶ 16} Antionette Walker testified that she was a child and adolescent assessment specialist at Beckett Springs.[2] Beckett Springs is a dual placement facility helping individuals struggling with mental health or substance abuse, or both. Walker explained that many of Beckett Springs' adolescent clients are referred from Cincinnati Children's after visiting that hospital for psychiatric emergency services. Ruby was referred to Beckett Springs by Cincinnati Children's after completing a psychiatric evaluation.

{¶ 17} Walker testified that her job was to conduct a "full psychosocial assessment" to determine the appropriate level of care for treatment at Beckett Springs. The purpose of the assessment was to determine the "stressors" in the patient's life, the current symptoms of the patient's mental health, any history of trauma, and the patient's environment. Walker then made a referral based on the appropriate level of care.

{¶ 18} Walker testified that on March 19, 2024, she met and spoke with both Ruby and Mother. Ruby presented with symptoms consistent with suicidal ideation, dysregulated mood disorder[3], generalized anxiety, and audio and visual hallucinations.

{¶ 19} Walker testified that Ruby reported experiencing suicidal ideation "with intent" at Grandmother's home two weeks prior to the assessment date. "With intent" means suicidal thoughts with actual intent to kill oneself. Ruby reported to Walker that she only experienced suicidal ideation when she was at Grandmother's home, due to

---

2. "Antionette" may be a spelling error, but we will use this spelling as it is the one used in the record.

3. Walker explained that dysregulated mood disorder means highs and lows in mood and can be a cyclical pattern of mania and depression.

"emotional abuse" from Grandmother. Ruby reported that beginning at the age of 3, she had endured emotional abuse by Grandmother, including by being locked in her bedroom.

{¶ 20} When Walker spoke to Ruby about her history of trauma and specifically loss she had experienced in her life, Ruby discussed her parents divorcing when she was three and a half and the strained relationship between her divorced parents. She also discussed Mother's serious illness.

{¶ 21} Walker testified that she conducted a suicide risk assessment titled the "Columbia-Suicide Severity Rating Scale." The factors that Walker considered in this assessment included Ruby's preexisting mental and emotional conditions, Ruby's history of trauma and loss, and Mother's serious illness. In addition, Walker noted that Ruby had access to guns at Father's home. Based on this assessment, Walker believed that Ruby was at high risk of suicide.

{¶ 22} Over Grandmother's objection, Walker offered her expert opinion that Ruby was "fixated on current stressors in her life regarding the relationship with [G]randmother," and this "seemed to exasperate her mental health concerns." Walker further opined as to the adjustments that she believed were needed in Ruby's environment. Walker understood that, at the time of the assessment at Beckett Springs, there was no contact occurring between Ruby and Grandmother. Walker believed that no-contact should continue until Ruby had received treatment to "stabilize."

{¶ 23} Walker's written records of the assessment, including Ruby's various statements to Walker about her then-current mental health, were introduced as an exhibit and admitted into evidence.

### C. Magistrate's Decision, Objections, and Judge's Decision

{¶ 24} At the conclusion of the full hearing before the magistrate, the parties presented closing arguments. Mother's counsel presented several arguments in favor of

granting the DVCPO, including the argument that the facts supported the conclusion that Ruby was an "abused child," referring to the (iii) subsection.

{¶ 25} The magistrate then announced his decision from the bench. The magistrate found that Mother had not established any of the grounds necessary to support the granting of a DVCPO under R.C. 3113.31(A)(1)(a)(i)-(iv). Specifically, the magistrate stated that there had been no evidence presented of Grandmother attempting to cause or recklessly causing bodily injury (referring to the [i] subsection), or of placing another in fear of imminent serious physical harm (referring to the [ii] subsection). The magistrate did not address the menacing-by-stalking or aggravated-trespass portions of the (ii) subsection. With respect to the (iii) subsection, the magistrate stated:

> I understand what you're [Mother's counsel] saying about abused child under 2151 § 031, however, the former prosecutor of child abuse in me doesn't like a child being locked into a room from the outside. I will grant you that. Is it abuse? No. Is it questionable parenting, sure.

{¶ 26} The magistrate did not refer to the (iv) subsection, which concerns sexually oriented offenses.

{¶ 27} The magistrate later issued a written entry summarily denying the DVCPO petition. The entry included no written explanation, findings of fact, or conclusions of law.

{¶ 28} Mother objected to the magistrate's decision. In her initial written objections, Mother argued that the magistrate's decision was not supported by the sufficiency of the evidence and was against the weight of the evidence because the evidence supported the conclusion that Grandmother engaged in acts sufficient to constitute menacing by stalking under R.C. 2903.211. Specifically, Mother argued that the evidence demonstrated that Grandmother "engaged in a pattern of conduct that knowingly caused [Ruby] to believe that [Grandmother] would cause physical harm and/or mental distress to [Ruby]." In other words, Mother was arguing that the evidence supported a finding of

domestic violence under the (ii) subsection. Mother stated that she reserved the right to supplement her objections once she had obtained a copy of the transcript. Mother did not refer to the (iii) subsection in her initial objections.

{¶ 29} Grandmother subsequently filed a memorandum opposing Mother's initial objections. Grandmother argued that based on Mother's objections, Mother was asserting that the evidence established her entitlement to a DVCPO based upon having established that Grandmother committed menacing by stalking, referring to the (ii) subsection. Grandmother asserted that "Mother rests her entire case" upon the assertion that menacing by stalking was established and therefore "this Memorandum will only address arguments related to this provision, notwithstanding the possibility that other legal theories could exist."

{¶ 30} Grandmother then argued why the evidence could not establish menacing by stalking. Specifically, she argued that the evidence did not demonstrate (1) a pattern of conduct, (2) that Grandmother acted "knowingly," or (3) that Grandmother's action caused Ruby fear of physical harm or caused mental distress.

{¶ 31} After the filing of Grandmother's memorandum in opposition, the domestic relations court issued an order stating that Mother could respond to Grandmother's filing on or before August 14, 2024. The court also set an objection hearing for August 15, 2024.

{¶ 32} On August 14, 2024, Mother filed supplemental objections and a reply to Grandmother's memorandum in opposition. Among other arguments in this filing, Mother argued that the evidence supported the conclusion that Ruby was an "abused child" as defined under R.C. 2151.031(E), referring to the (iii) subsection.

{¶ 33} The domestic relations judge later issued an entry overruling the magistrate's decision. The judge stated,

> The record is replete with evidence of Respondent's

escalating conduct. The persistent and combative behavior of Respondent has caused harmful mental and emotional distress to minor child. The record indicates and the parties agree minor child has experienced significant trauma in her young life from the divorce litigation and bullying and has sought treatment for depression in the past. She is currently in treatment for serious mental illness and seeks support in this personal battle. She has conflicted feelings as she loves her grandmother and Respondent is not the only source of minor child's struggles. However, the fact that Respondent has full knowledge of minor child's emotional distress and yet continues to create a hostile environment in Respondent's home is concerning to the Court. Respondent's behavior is causing increased suicidal ideation; hallucinations; and thoughts of self-harm for minor child.

An abused child under R.C.2151.031 includes any child who "[b]ecause of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare." R. C. 2151.031(D). A person seeking a civil protection order must demonstrate by a preponderance of the evidence that he or she is in danger of domestic violence. *Felton v. Felton*, 79 Ohio St.3d 34, 42, 1997 Ohio 302, 679 N.E.2d 672 (1997). *M.C. v. B.K.*, 6th Dist. Sandusky No. S-14-032, 2015-Ohio-560

The reasonableness of the fear should be determined with reference to the history between the petitioner and the defendant." *Bargar v. Kirby*, 2011-Ohio-4904, ¶ 20 (12th Dist.)

There is abundant, competent, credible evidence to conclude minor child suffers mental and emotional injury because of Respondent's behavior that has served to exacerbate the suffering and that harm threatens to further injure the minor child's welfare. After review of the record, the evidence is sufficient to meet the requirements of ORC 3113.31(A)(1)(a)(ii) and (iii).

{¶ 34} Thus, the judge found that Mother had established grounds for a DVCPO under both the (ii) and (iii) subsections. The judge set aside the magistrate's decision, granted Mother's DVCPO petition, and issued a DVCPO by separate entry.

{¶ 35} Grandmother appealed and raised three assignments of error. We will address those assignments out of the order presented.

### III. Law and Analysis

- 9 -

## A. Waiver of Abused-Child Objection to Magistrate's Decision

{¶ 36} Grandmother's first assignment of error states:

THE TRIAL COURT ERRED BY FINDING THAT PETITIONER COMMITTED DOMESTIC VIOLENCE PURSUANT TO R.C. 3113.31(A)(1)(a)(iii) WHEN APPELLEE NEVER RAISED THIS PROVISION AS PART OF HER OBJECTIONS TO THE MAGISTRATE'S DECISION.

{¶ 37} Grandmother argues that Mother did not refer to the DVCPO statute's (iii) subsection—that is, the one referring to acts that would result in a child being an "abused child" under R.C. 2151.031—in her initial objections to the magistrate's decision and therefore she waived any argument that this subsection provided grounds to support the issuance of a DVCPO under R.C. 3113.31.[4] Thus, she further argues, the domestic relations court erred by sua sponte considering the (iii) subsection and finding that Ruby was an "abused child" under that subsection and overruling the magistrate's decision.

{¶ 38} As the basis for this argument, Grandmother cites Civ.R. 53 and specifically, Civ.R. 53(D)(3)(b)(ii), which states that "An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection."

{¶ 39} Grandmother admits that Mother "briefly" referred to the statutory definition of an abused child in her supplemental objections and response to Grandmother's memorandum in opposition. However, Grandmother argues that Mother did not request leave to file supplemental objections as required by Civ.R. 53(D)(3)(b)(iii). Grandmother argues that she was prejudiced by Mother raising this argument late, as she was unprepared to argue the abused-child issue at the telephone hearing on objections.

{¶ 40} As described above, Grandmother cites Civ.R. 53 as the basis of her waiver

---

4. While there is a distinction between "waiver" and "forfeiture," and "forfeiture" would normally apply when a party simply fails to do something and does not make some affirmative act of waiver, we note that Civ.R. 53(D)(3)(b)(iv) refers to a "waiver" as opposed to a "forfeiture" of the right to assign an issue as error on appeal. *See Settlers Walk Home Owners Assn. v. Phoenix Settlers Walks, Inc.*, 2015-Ohio-4821, ¶ 30, fn. 1 (12th Dist.).

argument. However, the procedural rules governing DVCPOs are set forth in a different rule, Civ.R. 65.1. Civ.R. 65.1(A) provides:

> Applicability; Construction; Other Rules. *The provisions of this rule apply to special statutory proceedings under R.C. 3113.31*, R.C. 2151.34, and R.C. 2903.214 providing for *domestic violence*, dating violence, stalking, and sexually oriented offense civil protection orders, shall be interpreted and applied in a manner consistent with the intent and purposes of those protection order statutes, and *supersede and make inapplicable in such proceedings the provisions of any other rules of civil procedure to the extent that such application is inconsistent with the provisions of this rule.*

(Emphasis added.) Thus, the rules of civil procedure do not apply to DVCPO proceedings to the extent they are "inconsistent" with the provisions of Civ.R. 65.1. Moreover, Civ.R. 65.1(F)(3)(b) specifically provides that a magistrate's denial or granting of a protection order after a full hearing *does not* constitute a magistrate's order or decision under Civ.R. 53(D)(2) or (3) "and is not subject to the requirements of those rules." Accordingly, Grandmother's argument that the provisions of Civ.R. 53(D)(3) applied in this case is meritless. *See Gambrel v. Segal*, 2025-Ohio-215, ¶ 14 (12th Dist.) (noting that a magistrate's decision in a dating violence civil protection order brought pursuant to R.C. 3113.31 was not subject to the requirements of Civ.R. 53[D][3].)

{¶ 41} Unlike under Civ.R. 53, there is no provision within Civ.R. 65.1 that required Mother to state her objections to a magistrate's decision with particularity or specificity. Instead, the rule provides that the party filing objections,

> has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order.

Civ.R. 65.1(F)(3)(d)(iii).

{¶ 42} Moreover, Civ.R. 65.1 does contain a section referencing supplemental

- 11 -

objections. Civ.R. 65.1(F)(3)(d)(iv) provides that "If a party files timely objections prior to the date on which a transcript is prepared, the party may seek leave of court to supplement the objections." In the case before us, Mother filed supplemental objections, but the record does not indicate that Mother sought leave to do so. Civ.R. 65.1 does not specify the consequence of a failure to specifically seek leave to supplement objections.

{¶ 43} Though Grandmother does not address this precise issue, she does argue that she was prejudiced because Mother did not specifically argue or cite the (iii) subsection in her initial objections and thus Grandmother was unable to present argument concerning this subsection in her memorandum in opposition and unable to prepare to discuss the (iii) subsection at a telephone hearing.

{¶ 44} But the record shows that Grandmother was not blindsided. Mother's initial objections specifically discussed menacing by stalking—referring to the (ii) subsection— but also stated, as a prefatory matter, that the magistrate's decision was against the manifest weight of the evidence "for the following reasons *(but not limited thereto)."* (Emphasis added.) Mother also indicated that she was reserving the right to supplement her objections after receiving the transcript. Thus, through the filing of the initial objections, Grandmother would have been at least aware that Mother anticipated adding additional arguments in supplemental objection briefing. Grandmother would also have been specifically aware that Mother might raise the (iii) subsection because Mother had already argued the applicability of that subsection at the conclusion of the full hearing. Moreover, in Grandmother's memorandum in opposition to Mother's initial objections, Grandmother specifically acknowledged that there might be other grounds that Mother could assert for finding that she engaged in domestic violence. Grandmother was clearly aware of the potential application of the (iii) subsection in this case.

{¶ 45} In any event, there is no support for the argument that the domestic relations

court was restrained from overruling the magistrate on a basis other than that specifically raised in Mother's initial objections. Civ.R. 65.1 provides that a magistrate's decision granting or denying a protection order after a full hearing is not effective unless adopted by the domestic relations court. Civ.R. 65.1(F)(3)(c)(i). The court may only adopt the magistrate's decision "upon review of the order and a determination that there is no error of law or other defect evident on the face of the order." Civ.R. 65.1(F)(3)(c)(ii). Thus, Civ.R. 65.1 requires the domestic relations court to conduct an independent review of the magistrate's decision and determine if the magistrate correctly applied the law. After having conducted this review, the court may "modify or reject the magistrate's order." Civ.R. 65.1(F)(3)(c)(iii). There is no limitation on how the court may modify the magistrate's order. Thus, even if Mother had never objected to the magistrate's decision, the domestic relations judge had the ability to modify the order and find that the (iii) subsection applied and that it was error for the magistrate to recommend denying the DVCPO. In other words, the judge's review and analysis were not constrained by the scope of Grandmother's initial objection.

{¶ 46} We overrule Grandmother's first assignment of error.

### B. The Admissibility of Mother's Expert Testimony

{¶ 47} Grandmother's third assignment of error states:

> THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED ANTIONETTE CHRISTY WALKER TO TESTIFY AS AN EXPERT.

{¶ 48} In this assignment of error, Grandmother identifies multiple purported errors with regard to the admission of Walkers' testimony. First, she argues that Walker's testimony should have been disallowed entirely because Mother failed to provide Grandmother with an expert report at least 30 days prior to the full hearing, in violation of Civ.R. 26(B)(7)(c). Second, Grandmother challenges Walker's credentials and argues that

she was not qualified to render an expert opinion. Third, Grandmother argues that Walker should not have been permitted to render an expert opinion because she failed to "conduct rigorous testing and conduct collateral review" and she "did not have all the necessary facts."

### 1. Procedural Background

{¶ 49} Before addressing these arguments, we note that upon Mother calling Walker to testify, Grandmother's counsel objected, stating that she was not certain whether Walker was being called to testify as an expert but that if she was, she lacked the qualifications to testify. The magistrate responded, "that's for me to decide." Walker was then permitted to testify.

{¶ 50} Mother's counsel proceeded with questioning Walker as to her professional credentials, including her education and employment background. But at the conclusion of this line of questions, Mother's counsel never asked the magistrate to recognize Walker as an expert in any particular field and the magistrate never explicitly stated he recognized her as an expert.

{¶ 51} Later, Mother's counsel asked, based on Ruby's history and the interview Walker conducted, whether Walker had an opinion "within a reasonable degree of social science certainty as to the risk of harm to [Ruby]?" Grandmother objected on the basis that Walker was not qualified to give an opinion because she was not a psychiatrist or psychologist. The magistrate overruled the objection, stating that Walker's response would not be a medical opinion and was "within the realm," presumably meaning within the realm of Walker's expertise as a social worker. The magistrate stated he would assign Walker's opinion "the weight it's worth."

{¶ 52} Walker then responded that she believed that Ruby was at high risk of self-harm "due to harm that's been placed on her by others." Mother's counsel then asked

Walker if she had an opinion within a reasonable degree of social science certainty as to "what caused the current crisis regarding [Ruby's] mental health?" Walker stated yes, and explained that "[Ruby] was very fixated on current stressors in her life regarding the relationship with [G]randmother. That seemed to exasperate her mental health concerns." There was no specific, second objection to this testimony.

{¶ 53} Thus, it appears that despite neither the parties nor the magistrate explicitly discussing whether the magistrate recognized Walker as an expert, the magistrate did in fact treat Walker as an expert witness. With this understanding, we will proceed to review Mother's expert witness arguments.

### 2. Failure to Provide Expert Report

{¶ 54} Grandmother argues that Walker's expert testimony should have been precluded based on Mother's failure to provide her with an expert report, which failure violated Civ.R. 26(B)(7). That rule addresses disclosure of expert testimony and provides, generally, that a party may not call an expert witness to testify "unless a written report has been procured from the witness and provided to opposing counsel." Civ.R. 26(B)(7)(c). The rule details the required contents of expert reports and further states that an expert cannot testify or provide opinions on matters not disclosed in the report.

{¶ 55} Our analysis begins with Civ.R. 65.1, which governs procedure in DVCPO proceedings, including discovery. As relevant here, Civ.R. 65.1(D)[5] states:

> (1) Time. Discovery under this rule shall be completed prior to the time set for the full hearing.
>
> (2) Discovery Order. Discovery may be had only upon the entry of an order containing all of the following to the extent applicable:
>
> (a) The time and place of the discovery;

5. While this appeal was pending, Civ.R. 65.1(D) was amended, effective July 1, 2025. We apply the version of the rule in effect at the time of the pertinent events in this case.

(b) The identities of the persons permitted to be present, which shall include any victim advocate; and

(c) Such terms and conditions deemed by the court to be necessary to assure the safety of the Petitioner, including if applicable, maintaining the confidentiality of the Petitioner's address.

{¶ 56} As discussed previously in response to Grandmother's first assignment of error, Civ.R. 65.1 supersedes the application of other civil rules to the extent those rules are inconsistent with the provisions of Civ.R. 65.1. Civ.R. 65.1(A).

{¶ 57} Civ.R. 65.1(D) has no provision like Civ.R. 26(B)(7)(c) prohibiting expert testimony in the absence of the timely exchange of an expert's report. Under Civ.R. 65.1(D)(2), discovery is "only" permitted upon the entry of a court order specifying the time, place, and terms necessary to ensure the safety of the petitioner. In other words, the parties are not obligated to provide any discovery unless directed by a judge or magistrate. Moreover, all discovery must be completed before the full hearing. Civ.R. 65.1(D)(1). These provisions indicate a more restrictive and expedited approach to discovery compared to typical discovery proceedings under Civ.R. 26. Therefore, we find that Civ.R. 65.1 supersedes the provisions of Civ.R. 26(B)(7).

{¶ 58} Neither party in this case requested that the court or magistrate issue discovery orders and the domestic relations court issued no such orders. As such, we find no error based on Mother not voluntarily providing Grandmother a report summarizing Walker's testimony and opinions. Nor has Grandmother identified a lawful basis on which we could conclude that the domestic relations court erred in permitting Walker to testify. Grandmother's Civ.R. 26(B)(7)(c) argument is without merit.

### 3. Walker's Credentials and the Reliability of Her Testimony

{¶ 59} Next, Grandmother challenges Walker's credentials and argues that she

was not qualified to render an expert opinion. Grandmother also argues that Walker should not have been permitted to render an expert opinion because she failed to "conduct rigorous testing and conduct collateral review" and she "did not have all the necessary facts" to render an expert opinion.

{¶ 60} Grandmother's argument assumes that Evid.R. 702, which governs the admissibility of expert testimony, is applicable in DVCPO hearings. For purposes of our analysis, we will assume—without deciding—that this is true.

### a. Applicable Law and Standard of Review

{¶ 61} Evid.R. 702 states:

A witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 62} The expert witness is not required to be the best witness on the subject, but

his or her testimony must assist the trier of fact in the search for the truth. *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159 (1978). The expert must demonstrate some knowledge on the particular subject superior to that possessed by an ordinary juror. *Scott v. Yates*, 71 Ohio St.3d 219, 221, 1994-Ohio-462. "A trial court has discretion to determine whether a witness is competent to testify as an expert, and the trial court's decision will not be reversed absent a clear showing that the court abused its discretion." *Celmer v. Rodgers*, 2007-Ohio-3697, ¶ 19. Likewise, "[a] ruling concerning the admission of expert testimony is within the broad discretion of the trial court and will not be disturbed absent an abuse of discretion." *Schneble v. Stark*, 2012-Ohio-3130, ¶ 20 (12th Dist.).

**{¶ 63}** Trial courts have broad discretion in determining whether evidence is admissible. *Lykins v. Hale*, 2023-Ohio-752, ¶ 27 (12th Dist.) With regard to expert opinions, trial courts have been deemed "gatekeepers" who must screen such evidence for relevance and reliability. *Id.*, citing *State Farm Fire & Cas. Co. v. Holland*, 2008-Ohio-4436, ¶ 14 (12th Dist.).

### b. Walker's Qualifications

**{¶ 64}** At the hearing, Walker identified her curriculum vitae and it was admitted into evidence. Walker testified to her educational and employment background. She held a bachelor's degree with concentrations in law enforcement, justice administration, and French, a master's in science in education, and she stated that in 19 days she would have a master's degree in social work. She stated that she was a licensed social worker in the State of Ohio.

**{¶ 65}** Walker testified that she was employed in the field of social work as a child and adolescent assessment specialist and had been so employed for approximately one year. As an assessment specialist, she conducted "full psychosocial assessments" of patients to determine the appropriate level of care for treatment. Walker testified that she

would conduct 36 to 50 assessments per month and estimated that she had performed a total of 500 assessments. Walker testified that 95 percent of her assessments had been with children.

{¶ 66} Given Walker's professional and education background, and specifically her experience in conducting hundreds of psychosocial assessments, we conclude that Mother demonstrated that Walker possessed the requisite "specialized knowledge, skill, experience, training, or education" to be considered an expert with respect to psychosocial assessments intended to assess the level of care a patient may need at a mental health facility and suicide risk assessments. Evid.R. 702(B). We therefore do not find that the trial court abused its discretion in allowing Walker to testify as an expert on these matters.[6]

{¶ 67} Grandmother also argues that Walker should not have been permitted to offer any medical opinions because she has no medical or psychiatric credentials. She argues that to offer any medical opinion about "the origins of [Ruby's] mental illness" "would have required a doctoral level in psychopathology, psychoanalysis, forensic psychology, or other related fields which study the origin of mental pathologies." Grandmother cites no authority for this argument, and relevant case law states otherwise. An expert witness who is not a physician, but who qualifies under Evid.R. 702, may give testimony relevant to a medical condition if the testimony is within their expertise. *Shilling v. Mobile Analytical Services, Inc.*, 65 Ohio St.3d 252 (1992), syllabus. Walker's opinions on Ruby's possible diagnoses and the probable causes for these conditions were within Walker's realm of expertise given her educational and professional background.

---

6. Mother's counsel referred to Walker's expertise as being in the field of "social science." This is far too broad, as that term encompasses dozens of potential disciplines. The magistrate never specifically identified Walker's precise field of expertise, but we find the magistrate did not err in admitting Walker's testimony because the evidence supported her expert status in the far more limited field we have identified.

Moreover, the magistrate explicitly stated that he would assign Walker's opinion "the weight it's worth." Therefore, we find no abuse of discretion in the court permitting Walker to testify based on an alleged lack of credentials.

### c. Whether Walker's Testimony was Reliable

{¶ 68} Next, Grandmother argues that the trial court abused its discretion in admitting Walker's testimony because she failed to conduct "rigorous testing" and "collateral review," which Grandmother asserts were necessary for "making cause-and-effect determinations." Grandmother cites no authority for the proposition that offering an opinion as to cause-and-effect determinations requires "rigorous testing" and "collateral review."

{¶ 69} In her appellate brief, Grandmother does not specify what "rigorous testing" and "collateral review" Walker should have undertaken to render a reliable opinion. In her reply brief, Grandmother states that Walker should have performed a "diagnostic assessment with collateral review." Grandmother states that a "diagnostic assessment" goes "much further" than a psychosocial assessment and "pinpoint[s] the exact cause of a specific mental health condition through highly standardized methods and procedures." Grandmother states that such testing can only be completed by "highly trained mental health professionals--often doctorate level practitioners."

{¶ 70} Grandmother cites no authority for these claims concerning the distinctions between psychosocial assessments and diagnostic assessments. There is nothing in our record about "diagnostic assessments." Grandmother did not offer any evidence in this case and there is no other evidence of record that would permit us to conclude that the psychosocial assessment performed by Walker was unreliable.

{¶ 71} Upon review, we find no abuse of discretion in the domestic relations court's admission of Walker's testimony. At the outset, we note that Walker's objected-to expert

opinion was that Ruby was "fixated on current stressors in her life regarding the relationship with [G]randmother. That seemed to exasperate her mental health concerns." Walker also opined that she believed that no contact between Ruby should occur until Ruby had stabilized and that Ruby was at a high-risk of suicide.

{¶ 72} Walker conducted a psychosocial assessment of Ruby, which, as detailed in her written assessment notes, was comprehensive. Ruby, who was 11 years old, described suicidal thoughts while at Grandmother's home and attributed these thoughts to Grandmother's yelling and screaming and locking Ruby in her room. Walker testified that Ruby appeared to be telling her the truth.

{¶ 73} In sum, based on the evidence in the record, Walker's opinion testimony appears to be based on a reliable method of interviewing Ruby to determine her past and present history of trauma to determine the appropriate level of care for the medical practitioners at Beckett Springs. There is nothing in our record that would demonstrate that the magistrate abused his discretion in allowing Walker's opinion as to the cause of Walker's mental health issues.[7]

{¶ 74} Finally, Grandmother argues that Walker did not possess the "necessary facts" to render an opinion as to the cause of Ruby's mental health concerns. But Grandmother does not describe what "necessary facts" Walker lacked. Walker's written assessment contained numerous facts relating to Ruby's present condition and history of

---

7. Grandmother's argument seems to try to take advantage of the tendency in our society of viewing "expert" opinion as nearly all-knowing. But it is wrong to suggest, as Grandmother does here, that only "highly-trained mental health professionals—often doctorate level practitioners" have the ability to offer valuable opinions or knowledge about a child's mental state and interactions with others that may impact that mental state. This is not to say that just anyone may be called on to testify about such matters. There is a reason why Evid.R. 702 exists: to provide a baseline for determining who may offer testimony about specialized topics not necessarily in the knowledge of the average person. Here, Walker's credentials and experience, while more limited that those of a psychologist, satisfied Evid.R. 702's requirements. The magistrate gave her testimony "the weight it's worth," which is an appropriate approach to expert testimony. Experts assist courts by providing specialized knowledge, but they need not be drawn only from the select, extremely "well-credentialed" few as though they were flawless oracles.

trauma and we fail to see how Grandmother can claim that Walker did not have sufficient facts to offer an opinion as to the causes related to Ruby's suicidal ideation and other mental health concerns.

{¶ 75} For these reasons, we find nothing in the record that would establish an abuse of discretion in the decision to admit Walker's testimony. We overrule Grandmother's third assignment of error.

### C. Evidence Supporting Decision to Grant DVCPO

{¶ 76} Grandmother's second assignment of error states:

> THE TRIAL COURT ERRED IN DETERMINING THAT APPELLANT COMMITTED DOMES[T]IC VIOLENCE PURSUANT TO R.C. 3113.31(A)(1)(a)(ii) and RC 3113.31 (A)(1)(a)(iii).

{¶ 77} Grandmother argues that Mother failed to meet her burden of proof and that the trial court's finding that Ruth was placed in danger of domestic violence by Grandmother was against the manifest weight of the evidence. Mother argues that the evidence did not support the trial court's findings under either the (ii) subsection or the (iii) subsection.

### 1. Standard of Review -- Manifest Weight of the Evidence

{¶ 78} "'A trial court's decision to grant or deny a DVCPO will not be reversed where such decision is supported by the manifest weight of the evidence.'" *Porter v. Porter*, 2020-Ohio-4504, ¶ 36 (12th Dist.), quoting *Barrett v. Barrett*, 2017-Ohio-250, ¶ 19 (12th Dist.). "The standard of review in a manifest weight challenge in a civil case is the same as that applied to a criminal case." *Chasteen v. Lynch*, 2024-Ohio-5857, ¶ 95 (12th Dist.).

{¶ 79} In considering a manifest weight challenge, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and

determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial. *Halcomb v. Greenwood*, 2019-Ohio-194, ¶ 36 (12th Dist.). A judgment will not be reversed as being against the manifest weight of the evidence where the judgment is supported by some competent, credible evidence going to all essential elements of the case. *Id.* An appellate court is required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate factual conclusions. *Holland v. Garner*, 2010-Ohio-2963, ¶ 8 (12th Dist.).

## 2. Analysis

{¶ 80} The domestic relations court found that Mother established that Grandmother engaged in acts of domestic violence under both the (ii) subsection and the (iii) subsection. As we find the (iii) subsection dispositive, we limit our discussion to that subsection.

{¶ 81} As described above, the (iii) subsection requires the commission of "any act" that would result in a child meeting the definition of an "abused child" as set forth in R.C. 2151.031. R.C. 2151.031, in relevant part, provides that an "abused child" includes any child who "[e]xhibits evidence of any physical or mental injury or death, inflicted other than by accidental means," R.C. 2151.031(D), or who "[b]ecause of the acts of the child's parents, guardian, custodian, or caretaker, suffers physical or mental injury that harms or threatens to harm the child's health or welfare," R.C. 2151.031(E). The Revised Code defines "Mental injury" as "any behavioral, cognitive, emotional, or mental disorder in a child caused by an act or omission that is described in section 2919.22 of the Revised Code [the child endangering statute[8]] and is committed by the parent or other person

---

8. "Abuse the child" is an act described in the child endangering statute. R.C. 2919.22(B)(1).

responsible for the child's care." R.C. 2151.011(B)(24).

{¶ 82} Grandmother cites *Latz v. Latz*, 2020-Ohio-5139 (11th Dist.) for the general proposition that Mother was required to present evidence connecting her actions with Ruby's mental injury. That is, Grandmother's argument is that Mother presented no evidence causally linking Grandmother's actions to any mental injury suffered by Ruby.

{¶ 83} Upon review, we find that the record contains competent and credible evidence establishing, by a preponderance of the evidence, that Ruby was "in danger of domestic violence" because Grandmother committed acts that caused Ruby to suffer "mental injury" that "harms or threatens to harm" Ruby's "health or welfare," rendering her an "abused child." R.C. 2151.031(E); R.C. 3113.31(A)(1)(a)(iii).

{¶ 84} Specifically, Ruby testified that she felt suicidal due to being yelled and screamed at by Grandmother while in Grandmother's care. Ruby testified that Grandmother would yell at her and also lock her in her room for prolonged periods of time. Ruby also testified that Grandmother would speak derogatively about Mother in Ruby's presence.

{¶ 85} Walker testified that Ruby was suffering from suicidal ideation with the intent to kill herself while at Grandmother's home. Ruby reported to her that she was only experiencing suicidal ideation while at Grandmother's home. Walker testified that Ruby was "fixated" on her stressful relationship with Grandmother and that this was exasperating Ruby's mental health concerns.

{¶ 86} Thus, there was evidence presented both that Ruby suffered a "mental injury" (suicidal ideation with intent) and that Grandmother's behavior towards Ruby was a cause of this mental injury. If Ruby was contemplating suicide while in Grandmother's care, this was a mental injury that harmed or threatened to harm Ruby's health or welfare. R.C. 2151.031(E); R.C. 3113.31(A)(1)(a)(iii).

{¶ 87} Ruby also attributed suicidal thoughts to experiencing bullying at school. And Grandmother points to this as evidence that Ruby's mental injury was not causally linked to Grandmother's actions. However, simply because there were additional bases for Ruby's suicidal ideation does not establish a lack of causation between Grandmother's actions and Ruby's mental injury.

{¶ 88} The evidence, as discussed above, supported the domestic relations court's finding that Grandmother's actions were a contributing cause to Ruby's mental injury and thus provided evidence to support the "abused child" finding under R.C. 2151.031(E) and the (iii) subsection.

{¶ 89} Grandmother next argues that Ruby could not be considered an abused child under R.C. 2151.031(D) because there was no evidence that she intentionally inflicted a mental injury on Ruby. However, we need not consider this issue because as we have already determined, there was competent and credible evidence to support the abused child finding under R.C. 2151.031(E).

{¶ 90} Finally, Grandmother argues that there was no evidence that Ruby suffered a "mental injury" as defined in R.C. 2151.011(B)(24). Grandmother states that mere "mental distress" is not enough and that "mental injury" must be "evidenced by a mental disorder."

{¶ 91} The record provides competent and credible evidence that Ruby suffered "any behavioral, cognitive, emotional, or mental disorder. . . " R.C. 2151.011(B)(24). Ruby's testimony, Walker's testimony, and the admitted medical records establish that Ruby was suffering from suicidal ideation, dysregulated mood disorders, and unspecified psychosis resulting in audio/visual hallucinations. Grandmother does not explain or cite any authority as to why these conditions would not constitute a "mental disorder" and would instead only constitute "mental distress."

{¶ 92} In support of her argument, Grandmother cites *In re N.J.*, 2017-Ohio-7466 (12th Dist.). In that case, which involved an adjudication of abuse and dependency, we found that the state had not presented evidence of "mental injury" with respect to two children and therefore the juvenile court's finding that these children were abused was not supported by clear and convincing evidence. *Id*. at ¶ 53. *N.J.* is distinguishable simply because Mother presented evidence (described above) that Ruby suffered from a mental injury.

{¶ 93} Accordingly, we find that competent and credible evidence supported the trial court's finding that Grandmother committed any act with respect to Ruby that would result in Ruby being an abused child for purposes of the (iii) subsection and thus justified the domestic relations court's issuance of a DVCPO. We overrule Grandmother's second assignment of error.

## IV. Conclusion

{¶ 94} For the reasons described above, we find no merit to and overrule Grandmother's three assignments of error.

{¶ 95} Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.

---

# JUDGMENT ENTRY

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas, Domestic Relations Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Matthew R. Byrne, Judge